# UNITED STATED DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____ )
                                  )
**JUDITH BLOWE,**                 )
                                  )
      **Plaintiff,**     )
                                  )    **Civil Action No.  15-0822 (JEB)**
    **v.**                )
                                  )    **Chief Judge James E. Boasberg**
**Deb Haaland, Secretary,**       )
**DEPARTMENT OF THE INTERIOR,**   )    **Date: January 30, 2025**
                                  )
      **Defendant.**   )
_____ )

## PLAINTIFF'S CORRECTED OPPOSITION TO
## AGENCY'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Judith Blowe, by and through counsel hereby files her Corrected Opposition to the Defendant's Motion for Summary Judgment.

## <u>Introduction</u>

Plaintiff Judith Blowe alleges in her Amended Complaint that she was subjected to discrimination based on her race (African American), sex (female), age (46), and prior EEO activity, when among other incidents, her supervisor provided false information for a desk audit, removed her duties and denied training and issued her a false performance appraisal, and on May 21, 2010, she learned she was not selected for the position of Deputy Ethics Counselor, GS-0301-14/14, DOI, OSM, Washington, DC, advertised under Vacancy Announcement #2010-004. Defendant seeks summary judgment on all claims.  As explained in detail below, the Agency's Motion for Summary Judgment should be denied because the undisputed evidence demonstrates that Ms. Blowe was selected for the Deputy Ethics Counselor position based on her years of experience with the Agency, including experience in the very same position for which she applied, her outstanding performance, and her knowledge of the Agency procedures and employees.

1

However, upon learning that the panel had selected an African American female with prior EEO activity, OSMRE Director Mr. Pizarchik illegally moved the position under his office and summarily selected Mr. Clark, a younger Caucasian male, for the position. The undisputed facts demonstrate that Ms. Blowe was discriminated against based on her race, sex, and age in the false information provided in the desk audit, denial of training and removal of duties, and false performance appraisal. Because Defendant omits relevant facts which clearly establish genuine issues of material fact are in dispute and Defendant omits or mischaracterizes material facts, the motion for summary judgment should be denied.

<u>**Statement of Facts**</u>

**A.      Ms. Blowe's background and experience.**

Ms. Blowe, an African American female, was a GS-13 Human Resources Specialist in the Agency's Office of Surface Mining Reclamation and Enforcement ("OSMRE"), Finance Administration Directorate, Human Resources Division. Defendant Exhibit (D Ex.) 18 at 68. At all times relevant to her Complaint her first level supervisor was Yvette Evans, Human Resources Director, and her second level supervisor was Ted Woronka, Assistant Deputy Director of Finance and Administration. *Id.*

From January 2007 through February 2008, and again from November 2009 through May 2010, the position of Deputy Ethics Counselor in OSMRE was vacant, and Ms. Blowe performed these duties as Acting Deputy Ethics Counselor. Complainant's Responses to the Agency's Interrogatories, Ex. A at 14. As OSM's Acting Deputy Ethics Counselor, Ms. Blowe was responsible for the planning, administration, and implementation of the agency's Ethics Program and for ensuring that it was executed in accordance with applicable ethics regulations and statutes, with emphasis on conflict-of-interest analyses of employees' outside activities and official duties. ROI Ex. F2 at 4-5. She was responsible for effectively communicating the ethics and compliance

standards and procedures to all employees and other agents, through training programs and publications; providing guidance to senior officers and senior managers on all ethics, business conduct and compliance matters and their impact on organizational effectiveness and business success; researching and providing advice and guidance to management and employees on various ethics issues to ensure their concerns remained free of conflicts of interest; conducting reviews of the ethics programs to evaluate effectiveness and adherences to statutes and regulations of OSM and Department policies; and coordinate the planning, development and implementation of ethics training activities. *Id.* Ms. Blowe was further responsible for researching applicable Federal laws, regulations, precedents, policies (i.e. Code of Federal Regulation, U.S. Code, Departmental Policies and Ethics Guide) and Surface Mining Reclamation Control Act of 1977 (SMRCA) pertaining to ethics and conflicts-of-interest issues;  was responsible for the Agency confidential reporting of federal employees, SGEs, State Commissioners and other stakeholders to disclose financial information; reviewed Confidential Financial Disclosure Reports, OGE 450, OGE 450A, DI-1993 and OSM-23 for conflict of interests; consulted with employees when there is a potential conflict of interests; provided various options to employees to eliminate the conflict (i.e., recusal, certificate divestiture, sell, and etc.); prepared confidential financial reports to the top executives and the Department on status of overdue mandatory confidential financial forms;  briefed the Human Resources Director and the Assistant Deputy Finance and Administration Director on status of filing and conflict of interest issues; served as the expert and represent OSM on Department-wide monthly ethics meetings; consulted closely with the cognizant staff functions, Legal, Internal Auditing, and Human Resources; and determined appropriateness of agency-wide compliance initiatives and provides guidance and oversight to ensure development and implementation of strategies, policies and programs. *Id.*  She perform all activities relating to standards of conduct, and ethical relationships with customers, contractors, suppliers, employees,

shareholders and the communities in which the company's business was being conducted; effectively communicated ethics and compliance standards and procedures to all employees and other agents, through training programs and publications; and communicated with the Office of Special Counsel and Office of Inspector General regarding confidential financial disclosure reports and/or ethics issues.  *Id.*  During periods she served as the Deputy Ethics Counselor, Ms. Blowe was rated as "Superior" in her performance appraisals.  Performance Appraisals, Ex. B.

Ms. Blowe has an Associate's and a Bachelor's Degree in Business Administration from Strayer University.  ROI Ex. F11a at 158-59.  At the time of her non-selection, she had completed twelve credit hours towards a Master's Degree in Public Administration from George Mason University.  *Id.*

### B.    Ms. Blowe engages in protected activity.

In 2009, Mr. Woronka stated to Ms. Blowe that he wanted to get her job upgraded and to complete a  desk audit when Ms. Evans came on board with the Agency.  Id. at 61.

After Ms. Evans came on board, Ms. Blowe attempted to speak to her about the desk audit, and Ms. Evans responded, "What makes [you] think that [you] do GS-14 work?" Id.  After Ms. Blowe explained to Ms. Evans her work, Ms. Evans responded that GS-13s do that and when a classifier learns that a supervisor does not want the desk audit that it normally does not happen. Id.

Ms. Evans later sent Ms. Blowe an email stating that she did not think that the position warranted an upgrade.  Id. at 62.  Ms. Blowe responded that when she came to the office, the office had not had a training person in 20 years, and all the training programs in the office were the result of her efforts and that Mr. Woronka should verify her work since she had not been in her position very long.  Id. at 63.

In approximately March 2009, Ms. Blowe requested a desk audit because she believed she was performing work at the GS-14 level while she was classified at the GS-13 level.  Ex. A at 5.

Ms. Evans began discriminating against Ms. Blowe in 2009 and she was denied attendance at an evaluator training program because Ms. Evans stated that a white female co-worker, Lisa Wise, had attended the training and stated the training would be most useful for employees who lead or participate in accountability reviews.  Id. at 76.  Ms. Blowe protested this decision because the training was free and it would be helpful for her.  Id.  Ms. Evans then found a $850 beginners training course at the USDA Graduate School which had no value to Ms. Blowe.  Id. at 77.  Ms. Blowe was denied attendance at a training course which cost $1000 because Ms. Evans said her department did not have the money but she sent Ms. Wise to the training and paid the cost.  Id. at 78.  Ms. Blowe requested to attend the Interior Department training committee meeting in Phoenix scheduled for October 14 and 15, 2009 and Ms. Evans denied the request and said they did not have the money to send her, but when an SESer reported to the Assistant Director that Ms. Blowe was not attending the training, suddenly Ms. Evans claimed that she had money to send Ms. Blowe to the training but Ms. Blowe could not attend because she had scheduled a doctor's appointment. Id. at 79.  Ms. Blowe requested to attend a meeting on November 16-20, 2009 for the Learning Management System core meeting in Phoenix.  Ms. Evans denied the request to attend the meeting due to lack of funding.  Id. at 80.  Again, Ms. Evans denied Ms. Blowe's request to attend a Human Capital Summit meeting on March 4, 2019 and Ms. Evans claimed there was limited seating and it was packed.  Ms. Blowe had received an email from a host of the meeting inquiring if she was coming, and the meeting was just across the street from her office, and Ms. Evans made special arrangements for Ms. Wise to attend but was only allowed to attend after Mr. Woronka intervened and said Ms. Blowe should attend because it involved her programs.  Id. at 81.  Ms. Blowe believes

she was denied training because of her race because the white female Lisa Wise was allowed to attend the training. Id. at 82.

In January 2010, Ms. Blowe learned that her position had not been upgraded to GS-14. *Id.* Shortly thereafter, Ms. Blowe filed an appeal of her desk audit, as well as an EEO Complaint alleging that Ms. Evans had discriminated against her by providing incorrect information to the desk auditor regarding the level and complexity of work she performed, which initially caused her desk audit to come back GS-12. *Id.*

Deputy Director of OSMRE Glenda Owens (African American female, 58 years old), hired both EEO Director Carolyn Mackey-Bryant and Ms. Evans. ROI Ex. F4 at 102. While Ms. Owens denies that she was aware of Ms. Blowe's EEO Complaint against Ms. Evans prior to the selection, Ms. Owens met with Ms. Mackey-Bryant on a recurring basis for a briefing on EEO complaints filed against the Agency. Ex. A at 16.

**C.    The vacancy for Deputy Ethics Counselor, GS-0301-14/14 is announced.**

In early 2010 the Secretary issued an order directing every bureau to have a full-time Deputy Ethics Counselor position at the GS-14 grade. Deposition of Joseph Pizarchik, Ex. C at 14:10-14. Because OSMRE was the smallest bureau in the Agency, it was requested that the Secretary grant an exception to this mandate. *Id.* at 14:22-15:5. The Secretary denied this request. *Id.*

On or around March 5, 2010, the Agency opened the vacancy for the GS-14 Deputy Ethics Counselor position. The major duties of the position included developing, revising, and interpreting OSMRE ethics policy and procedures in compliance with the SMCRA and government-wide ethics laws and regulations; coordinating the ethics program by establishing procedures and systems; preparing reports and providing advice on complex issues; reviewing the disclosure forms of Agency officials and other financial disclosure filers, advising employees on

conflicts of interest and necessary recusals; overseeing the annual ethics training program for OSM employees and providing training to senior officials and other employees; keeping OSM employees advised on the latest developments in ethics laws, regulations, and policies; and serving as the initial point of contact for the Office of Inspector General cases and referrals.   Ms. Blowe had been performing all these duties as the Deputy Ethics Counselor.

To qualify for the position, the applicants were required to have one year of specialized experience, defined as experience which has provided the applicant with experience coordinating and ethics program, reviewing disclosure forms, and advising on conflicts of interest, identifying deficiencies in the ethics program and taking necessary steps to rectify.  There was no educational requirement for the position.

The Position Description created on March 5, 2010, reflects that the Deputy Ethics Counselor was to serve in the Finance & Administration Division ("F&A") of OSMRE.  ROI Ex. F10b at 132; Ex. C at 19:22-20:3. The position reported to, and the selecting official was, the Assistant Director for F&A, Ted Woronka.  *Id.*; Deposition of Yvette Evans, Ex. D at 31:12-19; ROI Ex. F5 at 104.


**D.      Ms. Blowe is interviewed and selected for the position.**

Four candidates were selected for an interview: Ms. Blowe, Craig Clark (Caucasian male, 32 years old), Rosanne Kurwitz, and Matthew Fox.  ROI Ex. F12 at 189.  Mr. Clark is an attorney and previously served as an Ethics Counselor in the U.S. Marine Corps.  ROI Ex. F11b at 163.

Mr. Woronka and Kim Hintz interviewed, scored, and ranked the candidates.  *Id.*; Email and attachment from Ted Woronka, Ex. E.  Both Mr. Woronka and Ms. Hintz ranked Ms. Blowe first with a score of 24 and Mr. Clark second with a score of 23.  ROI Ex. F12 at 189; Ex. E.  Ms. Hintz informed Mr. Woronka that she wished to select Ms. Blowe because of her knowledge of

OSMRE's mission, organization, and structure, and because Ms. Blowe had routinely worked with employees of OSMRE and had established relationships and trust.  ROI Ex. F12 at 188.  Mr. Woronka informed Director of OSMRE Joseph Pizarchik (Caucasian male, 53 years old) and Deputy Director of OSMRE Glenda Owens (African American female, 58 years old) that the panel had selected Ms. Blowe for the position.  ROI Ex. F5 at 104-05.  Mr. Woronka explained to Mr. Pizarchik and Ms. Owens that they were recommending Ms. Blowe based on her experience and because she had acted as the Ethics Counselor previously and had managed the program and had knowledge of the program, had more inside experience and a strong training background, and had headed the executive development program at the time she was acting as the Ethics Counselor.  *Id*

Ms. Hintz and Mr. Woronka both congratulated Ms. Blowe on being selected for the position.  Ex. A at 6.

**E.    The Director's Office takes control of the selection and selects Mr. Clark.**

Immediately after receiving the results of the interview, Mr. Pizarchik took control of the selection process.  Ex. C at 27:16-19.  Based on Mr. Woronka's explanation, Mr. Pizarchik decided to move the position under the Director's Office.  *Id.* at 30:20-31:3.

The selecting official for a position is the individual in whose office the position will be located.  *See* Ex. C at 19:22-20:3; Ex. D at 31:12-19.  A Position Description defines the office in which the position is to be located.  ROI Ex. F10b at 132.  A Position Description must be certified by the agency official who makes the classification/job grading decision.  *Id.* at 133 ¶¶ 20-21.  The Agency never issued a new Position Description reflecting that the position was placed under the Director's Office.  It is a violation of the law to change the reporting authority after the selection is made.  ROI Ex. F9 at 121.  Furthermore, an employee cannot be reassigned until he/she has been in a new position for ninety days.  *Id.*

Mr. Pizarchik and Ms. Owens reinterviewed Ms. Blowe and Mr. Clark. Ex. C at 30:20-31:3. It was highly atypical for Ms. Owens to be involved in a selection for the Agency. Ex. A at 16; ROI Ex. F5 at 105; ROI Ex. F7 at 121. Mr. Pizarchik and Ms. Owens interviewed Ms. Blowe in person; however, Ms. Owens was not present in Mr. Clark's interview and participated by phone. Ex. C at 74:19-75:8. Mr. Pizarchik asked the candidates whether they had an arrest record and whether they paid their taxes on time. *Id.* at 59:4-61:9. These are not proper questions for an interview. Ex. D at 41:11-42:9. Ms. Owens served as the selecting official and selected Mr. Clark. ROI Ex. F4 at 99-100.

Mr. Pizarchik has no recollection of the specific questions asked during the interviews. Ex. C at 67:11-69:16. Mr. Pizarchik took notes during the interview, but did not produce them, despite specific requests from the Investigator. *Id.* at 61:14-19; ROI Ex. G2 at 243. The Agency also did not produce a list of the questions asked by Mr. Pizarchik and Ms. Owens. The Agency is required to retain records of the selection process for two years after the selection or the resolution of a complaint regarding the selection. ROI Ex. F15 at 222.

### The EEO Investigation

During the EEO investigation at the Agency, Ms. Blowe provided an affidavit and responded to the justifications offered by the Agency for the actions taken in her complaints. Ms. Blowe was a master at employee development and she was instrumental in developing and designing programs and she was doing competency and she was on the Department of Interior Human Capital team; she developed a leadership handbook to provide the leadership program participant a guide to understand the program. D Ex. 9 at pp. 59-86.

Ms. Blowe believes that Ms. Evans steered the outcome of the desk audit because she told Ms. Blowe her position would not be upgraded; she dropped Ms. Blowe's factor levels two

9

and three from 650 to 450 when she had not been at the agency long enough to understand Ms. Blowe's work and she falsely claimed that resources were available when they were not available; and falsely claimed she assigned Ms. Blowe work when she only told Ms. Blowe what she wanted done with a broad directive.  Id. at 67-70.

Ms. Blowe believes that Ms. Evans's actions were taken because she was black because as soon as she mentioned a desk audit, Ms. Evans went after her and questioned what makes her think she does GS-14 work and she made a comment that when the supervisor does not want a position upgraded, it normally does not happen, and at the time Ms. Evans did not even know Ms. Blowe.  Id. at 71. Ms. Blowe observed that Ms. Evans treated her white female colleague, Lisa Wise, a program analyst differently. Id.   Ms. Evans approved Ms. Wise to go to training that she denied Ms. Blowe.  Specifically, Ms. Evans denied Ms. Blowe an opportunity to attend the Human Capital Summit that she was invited to  and Ms. Wise was not but she said she made special arrangements for Ms. Wise to attend the training even though it was Ms. Blowe's team that was invited to the training.  Id. at 72. An individual responsible for the training sent Ms. Blowe an email asking if she was attending and Ms. Blowe said that she was but Ms. Evans said she was not going to the training.  Id. Ms. Evans made special provisions for someone to attend who was not invited and then denied Ms. Blowe's attendance when she was invited.  Id.

Ms. Blowe spoke to the classifier, Brian Harper, and  he informed her that he only had a few questions and everything would work out and she informed him that he needed to speak to her second level supervisor Mr. Woronka to verify  her job responsibilities and he said he would speak to him.  Id. at 73.

Mr. Harper stated to Ms. Evans that his initial assessment was an upgrade to GS-14. (Q . . ."You state in your email of September 28, 2009 to Ms. Evans in the third paragraph, "My initial assessment is resulting in an upgrade to the GS-14 provided all the duties are accurately

described. . . A. Yes" . . . Q. Immediately after you sent Ms. Evans your initial decision that Ms. Blowe's position warranted an upgrade to GS-14, Ms. Evans told you she wanted to meet with you, is that correct?  Y. Yes") D Ex. 18 at p.19 and 20.

The classifier, Mr. Harper, later said he spoke to Ms. Evans, and said he had additional questions.  Id. Ms. Blowe is familiar with Ms. Evans writing style and is sure that the questions were actually prepared by Ms. Evans. Id.  at 74.

Ms. Blowe met with Ms. Evans on January 10 [2010] and was told the outcome of the desk audit and that there was no complexity in her work and that she worked on a team and she did not make final decisions.  Id. at 74.

According to Ms. Blowe, she applied for the Deputy Ethics Counselor position through OPM's USA Jobs and was contacted for an interview and interviewed with Ted Woronka, the selecting official, and Kim Hintz, the Agency's Deputy Ethics Counselor, who is an attorney. D Ex. 18 at 68.  Ms. Blowe met Ms. Hintz in her capacity as the Acting Deputy Ethics Counselor for OSM, during monthly ethics meetings which they both attended. Id.

Ms. Blowe interviewed with Mr. Woronka and Ms. Hintz on April 21, 2010.  During the interview she "provided responsive and complete answers to the all questions" and following the interview she learned that she had been selected for the position in a discussion with Mr. Woronka, who told her she was his choice, and she received an email from Ms. Hintz stating that she was her choice, and a month after notice of the selection, she was out of town getting her ethics certification, and Ms. Hintz came up to her and congratulated her "for getting the job."  Id. at 69.

According to Ms. Blowe, "[i]n retaliation for [her] prior EEO activity, M[s]. Evans and Ms. Owens inserted themselves in the selection process to ensure that [she] was not selected.  The normal process for GS-14 selections in this office is that the panel makes the selection and Glenda Owens, Deputy Director of the Office of Surface Mining, signs off on their selection.  I have never

known the Director of OSM and Ms. Owens to conduct a second interview and make a selection for a GS-14 vacancy.  I believe had the white male been selected for the position the selection would have not changed.  I believe that had I been White with no prior EEO activity his view would have been entirely different." Id.

"Unlike what has happened in other GS-14 selections in OSM, Ms. Owens convened a second interview panel that consisted of her and Mr. Pizarchik.  Mr. Woronka, the selecting supervisor for the position was taken out of the process and Ms. Evans who had nothing to do with the position was inserted into the process.  She collected the resumes of those who had competed for the position form the staffing specialists as opposed to the selecting official, Mr. Woronka." Id.

"The agency's change in the selection process/practice for GS-14 positions was only applied to the position vacancy for which I was selected which clearly demonstrate pretext for discrimination.  For example, I applied for a GS-14 position in 2009 and Ted Woronka was the selecting official and he selected Lisa Wise (white, younger, no prior EEO activity).  Glenda Owens just signed off on this selection and did not get involved beyond this."  Id.

"Another example of this was when Terry Trojanar (white, no prior EEO complaint activity) was selected for a GS-14 vacancy. Mr. Woronka was the selecting official and Mr. Owens just signed off on his selection."  Id. at 70.

Ms. Blowe explained why she was the most competitive candidate for the position:

"I know the Agency well.  I am the most competitive and best qualified for the position in question because I have actual experience performing the duties of the position in the Office of Surface Mines.  The selectee, Mr. Craig, does not have experience performing these duties in the Office of Surface Mines nor does it appear that he has been an ethics counselor for a civilian organization. His experience appears to be in a military environment.  I have experience working in both a

military organization, DOD, and a civilian organization.  Having worked in Human Resources, I am familiar with the types of positions we have in the organization and can engage personally and immediately I performed the duties of the Deputy Ethics Counselor from January 2007 to February 2008 when the position was vacant.  The position was then occupied in February 2008, by Mr. Robinson and became vacant again in November 2009.  I was again assigned these duties again until it was filled permanently in May 2010."  Id. at 70-73.

"As OSM's Acting Deputy Ethics Counselor, I was responsible for the planning, administration, and implementation of the agency's Ethics Program and for ensuring that it is executed in accordance with applicable ethics regulations and statutes, with emphasis on conflict-of-interest analysis of employees' outside activities and official duties.   Responsible for effectively communicating the ethics and compliance standards and procedures to all employees and other agents, through training programs and publications.  Provided guidance to senior officers and senior managers on all ethics, business conduct and compliance matters and their impact on organizational effectiveness and business success.  Researched and provided advice and guidance to management and employees on various ethics issues to ensure their concerns remains free of conflicts of interest; conduct reviews of the ethics program to evaluate effectiveness and adherences to statutes and regulations of OSM and Department policies; and coordinate the planning, regulations of OSM and Department policies; and coordinate the planning, development and implementation of ethics training activities.  Researched applicable Federal laws, regulations, precedents, policies (i.e. Code of Federal Regulation, U.S. Code, Departmental Policies and Ethics Guide,)  and Surface Mining Reclamation Control Act of 1977 pertaining to ethics and conflicts-of-interest issues.  Responsible for the agency confidential reporting of federal employees, SGEs, State Commissioners and other stakeholders to disclose financial information.  Reviewed Confidential Financial Disclosure Reports, OGE 450, OGE 450A, DI-1993 and OSM-23 for

conflict of interests. Consulted with employees when there is a potential conflict of interests. Provided various options to employees to eliminate the conflict (i.e., recusal, certificate divestiture, sell, and etc.). Consulted with Chief Counsel as needed to remove difficult legal compliance issues[.] Review employees DI-1958 Form (Widely Attended Gathering) and Di-2000 Reports of Payments Accepted from Non-Federal Sources to ensure that there is not conflict of interest. Represented the agency at the Department's monthly ethics meeting to keep abreast of ethics requirements. Conversed and responded to employees' inquiries regarding standards of conduct, political activities, outside, acceptance of gifts, use of government equipment and etc. Worked with employees and clients to resolve complex ethics issues (i.e., regulated investment companies, recusals, waivers and etc.). Research various federal regulations, law and Departmental policy relative to ethics and base interpretations on applicable laws. Id.

"Prepared confidential financial reports to the top executives and the Department on status of overdue mandatory confidential financial forms. Briefed Human Resources Director and Assistant Deputy Finance and Administration Director on status of filing and conflict of interest issues. Serve as the expert and represent OSM on Department-wide monthly ethics meetings. Consulted closely with the cognizant staff functions, Legel, Internal Auditing, and Human Resources. Determined appropriateness of agency-wide compliance initiatives and provides guidance and oversight to ensure development and implementation of strategies, policies and programs. Perform all activities relating to standards of conduct, and ethical relationships with customers, contractors, suppliers, employees, shareholders and the communities in which the company's business is being conducted. Effectively communicate ethics and compliance standards and procedures to all employees and other agents, through training programs and publications. Communicated with the Office of Special Counsel and Office of Inspector General as it relates to confidential financial disclosure reports and/or ethics issue." Id.

"I provided a wide range of advisory, consulting services and interpretations on policies in the areas of outside employment, confidential financial disclosure forms, gifts, speaking and other fees, fund raising and etc.  In completing these responsibilities, I rely on a vast array of guidelines, laws, regulations and procedures mandated through the Code of Federal Regulations, Office of Government Ethics/Special Counsel, U.S. Code, Departmental Policies and Ethics Guides.  Utilize OGE regulations which provides the general criteria for who should file confidential forms (5CFR 2634.904).   The criterion includes involvement in contracting, regulating or auditing any nonfederal entity, and other activities in which the final decision will have a direct substantial economic effect on the interest of any non-federal entity. I constantly update my knowledge through continuous training opportunities, researching policies, attending briefings, and volunteering to assist in areas where I can enhance my knowledge of ethics issues and related matters. Based on applicable laws, determine whether or not there is a substantial likelihood that one of the following conditions has been disclosed as it relates to ethical issues and/or filing violation of law, rules and/or filing violation of law, rules and and/or regulation.  Utilize knowledge of appropriate OGE regulations, CFR and agency policies to identify and resolve ethics issues associated with filing and personnel issues.  Review, analyze and interprets regulations, directives and appropriate bureau policy or OGE regulations; issues decisions based on interpretation of applicable regulations.  I have coordinated and contributed to the development of DOI revised or new policy for Departmental Manual, OSM's Ethics Training/briefing, regarding administering training and development within OSM and to ensure alignment with workforce and strategic Planning.  When requested by State Attorney's/Ethics Official to disclose confidential financial disclosure forms to the requested office, research aforementioned laws." Id.

"Oversee the agency's public disclosure and financial controls and procedures for financial reporting and compliance with the Department's code of business conduct and ethics to ensure that

the agency maintain its integrity and accountability's.   Independently, manage the agency Compliance Program, reviews and evaluates compliance issues/concerns with the organization. Ensured that the management and employees are in compliance with the rules and regulations of regulatory agencies, that agency policies and procedures are followed, and that behavior in the organization meets OSM's Standards of Conduct.  Assisted in development and revision of ethical policies and procedures for the general operation of the Compliance Program and its related activities to prevent illegal, unethical, or improper conduct.  Managed day-to-day operation of the program.  Collaborated with other departments (e.g.  Risk Management, Internal Audit, Employee Services, etc.) to direct compliance issues to appropriate existing channels for investigation and resolution." Id.

"Conversed with Deputy Ethics Counselor, State of Wyoming regarding a state employee's stock holdings.  The ethics counselor stated that the employee's stockholdings was a diversified investment company (Berkshire Hathaway).  The employee had stated that the stockholding were diversified stock; therefore, they did not have a document the information on OSM-23 Form.  I researched the Berkshire Hathaway Company and found that Berkshire Hathaway stock is a diversified company, but it is not in a widely held diversified mutual funds and that it was a regulated investment company.  I researched applicable US Code Title 26 to define regulated investment company and guidance provided in the OSM-23 Form.  The law states that you exclude holdings in widely held diversified mutual funds, investment clubs or regulated investment companies not specializing in underground and surface coal mining operations.  Upon my research, I conveyed to the Deputy Ethics Counselor that Berkshire Hathaway does not meet the criteria of being excluded from documenting." Id.

"I have received recognition for my excellent work as the Acting Ethics Counselor. I received an award from Ms. Evans in June 2010. In 2010, Ms. Evans to me that while I was in this position, she was confident that ethics was in compliance." Id.

"Also, the Deputy Ethics Counselor for the state of Wyoming, Mr. Uzell called Ms. Evans regarding my performance on addressing his ethics question. Mr. Uzell told Ms. Evans when he has to contact OSM, he would always cringe because he did not know whether he was going to get the right answer or have to look the answer up himself. He stated that the question was complex and he was not able to find the answer. He answered to her that I had returned his call for clarification on what was being requested and he was impressed with my customer service skills and ability to answer his question. He stated to her when an employee stands out, he has to let the supervisor know – and he was referring to me. This was the result of me researching and answering his ethics question." Id. at 73.

Ms. Blowe believed she was better qualified for the position. "The selectee worked for another part of the government. [Ms. Blowe] performed in the position already and received an award. [She] knew the job and the agency. [The selectee] did not know the job, had no prior experience performing this job and [Ms. Blowe] was the better candidate. "[She] recently received certification training in ethics." Id. at 74.

"The vacancy announcement for the position did not identify a law degree or a background in law as a qualification for the position. A law degree is not required or part of this job series. This is a general 0301 series and no degree is required. Given the fact that Ms. Hintz was on the initial interview panel and she is a lawyer, she would not have selected me for the position if she believes that was a legitimate factor in the selection process. It is a prohibited personnel practice to grant any preference or advantage not authorized by law, rule, or regulation to any employee or applicant for employment (including defining the scope or manner of competition or the

requirements for any position) for the purpose of improving or injuring the prospects of any particular person for employment (Section 2302 Title 5 U.S. Code). To use a law degree as a selection factor when it is not required either in the position description or vacancy announcement for the purpose of injuring my chance to be selected is against the law and is pretext to discriminate against me in retaliation for filing an EEO complaint." Id. at 74

"The panel's assertion that I did not have experience researching ethics issues suggests that they were involved in my day to day activities and there were not. This statement is simply untrue. Mr. Pizarchik is new to the Agency and would have no idea about what I did in this position. Ms. Owens is the SES Deputy Director and she and I have had no occasion to discuss what I do on a day to day basis. But the research and counseling I performed was included in my resume/ Contrary to what they alleged, I have more than book knowledge, I have working knowledge based on my experience as an ethics counselor." Id. at 74-75.

"During the interview with Mr. Pizarchik and Ms. Owens, I was asked whether or not I had ever made a mistake dispensing ethics advice. I supplied an honest response to the question and PIzarchik is now citing that hones response as a reason for non-selection. Mr. Pizarchik's action promotes lying during interviews which is entirely unethical. Mr. Pizarchik indicates that the selectee did not state that he made a mistake dispensing ethics advice. Mr. Pizarchik has no way of knowing whether or not Mr. Clark was being truthful. Who is more credible: the person who admits a mistake or the person who claims to have never made a mistake? There is a big difference between making a mistake – we all are guilty of that—and doing something wrong. Most people don't intentionally go around making mistakes. I don't intend to justify the mistake but another fact for the record is that I performed the duties and responsibilities of the Deputy Ethics Counselor to include dispensing advice and counseling, collecting and reviewing financial disclosure states as co-lateral duties to my primary position which is Human Resources Specialist. (Employee

Development).  In the instance, where I acknowledged making a mistake, it involved more of a lack of clarity in the presentation of the issue to me and not something that I did wrong.  Once the details of the issue were properly framed, the correct advice was given and no harm was done.  I learned from this situation that it is important to ask probing questions to get people to better describe the problem before giving a response.  I have learned in my life that the important thing is to admit it when you've made a mistake, learn from it, and move on.  If you openly admit to a mistake and have grown from it, more often than not you will be viewed positively, and as someone with integrity and character.  I believe  that the Director's choosing to view my honest response to his question as negative and a reason not to select me for the position is pretext to discriminate.  I believe that had I been White with no prior EEO activity his view would have been entirely different."  Id. at 75

"Mr. Pizarchik took a statement involving my opinion out of context in an effort to justify my non-selection.  While I don't specifically recall the question to which I made the statement, I am well aware that the Surface Mining and Reclamation Act and supporting regulations and policies require all OSM employees to file financial disclosure statements and I made my knowledge of that fact known during the interview.   In the exercise of my duties and responsibilities as the Acting Deputy Ethics Officer over an 18-month period, I have been diligent in trying to ensure 100% compliance with the filing requirement.  Unless these requirements change through a change in the law, regulation, or policy, I also know that all OSM employees will have to file.  My opinion about filing was formed in part in response to an Office of Government Ethics Report, dated February 16, 2009, and findings relative to the OSM ethics program in which it was suggested that OSM officials re-evaluate the determination to require all employees to file financial disclosure reports.  Based on my knowledge of Human Resources, duties and responsibilities of some positions within the agency do not appear to directly or

indirectly influence the regulating, permitting, approval and/or enforcement of underground or surface coal mining operation.  I was simply stating an opinion that those positions could be re-evaluated.  Again, I believe that had I been White and had not filed an EEO complaint, more value would have been placed on thinking "outside the box."  Id. at 76.

"I believe that my responses to the interview questions were more truthful and in touch with the issues being faced by the agency and reflects a greater knowledge and ability to perform the job than the selectee who had never performed the job, worked with the agency or as a federal civilian ethics counselor."  Id. at 76.

"Also, Mr. Pizarchik told me that he flew out to Colorado for a meeting and interviewed Mr. Clark.  He never stated that Ms. Owens interviewed him only himself."  Id. at 76.

"I believe I was not selected based on my race, sex, age and prior EEO complaint.  My earlier complaint is against Ms. Evans and I know she played a role in my non-selection.  I know she contracted Janelle Gross-Ducre, Human Resources Specialist, (Staffing and Classification) and told her that she needed copies of all the resumes for the aforementioned position and that Ms. Owens requested them.  After she did this, the selection process changed and I was re-interviewed.  There was no reason for her to become involved.  On the day of my interview and right after Ms. Evans walked into the directors' office, where Ms. Owens was already present.  I believe Ms. Evans influenced my candidacy for this position.  She and Ms. Owens have become friends, since her hiring.  I know that Ms. Owens hired Ms. Yvette Evans against Mr. Ted Woronka's objections.  She did not qualify for the first round of interviews and the announcement was canceled because Mr. Woronka and Ms. Owens could not agree on who to hire.  The position was re-advertised and she was then selected."  Id. at 76-77.

"Since I have filed my complaint against Ms. Evans, she has distanced herself and continues to treat me in a hostile manner.  Since I filed this complaint, she denied me training,

marks up my work, and sends me harassing emails. I requested leave last Thursday and she harassed me for asking for leave alleging I was taking three consecutive days off. Friday was my AWS day, Monday was a holiday and I was taking Tuesday evening off. She knew this but framed it that way to harass me." Id. at 77.

"The selection record of the agency shows a bias against Black females and employees over the age of 40. There are no GS-14 black females in the Finance and Administrative Directorate. Qualified Black females, including me, compete for these positions and are not selected in favor of less qualified Whites who are under 40 years of age. In regard to race and age, the last three GS-14 vacancies selectees in this Directorate have been women under forty and all were white. The selectee for this vacancy is a younger white male." Id. at 77.

## III.   ARGUMENT

### A.      Standard for summary judgment.

Federal Rule of Civil Procedure 56 provides that a district court shall grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." There is a genuine issue as to a material fact if the evidence is such that a reasonable factfinder could enter judgment for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986). If factual issues can "reasonably be resolved in favor of either party," there is a need for a hearing. *Id*. at 250. The Commission, therefore, "should review all of the evidence in the record," *Reeves v. Sanderson Plumbing Prods., Inc*., 530 U.S. 133, 150 (2000), viewing the evidence in the light most favorable to the non-moving party and according to that party the benefit of all reasonable inferences. *Anderson*, 477 U.S. at 255.

At this stage of the proceedings, the Commission is not to make credibility determinations or weigh the evidence. *Reeves*, 530 U.S. at 150. Only if, after examining the evidence, the Commission finds that a party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at [a hearing]," is summary judgment appropriate.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Jackson v. Finnegan*, 101 F.3d 145, 150 (D.C. Cir. 1996).

An employee makes out a prima facie case of disparate treatment discrimination by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the adverse action gives rise to an inference of discrimination. *Czekalski, v. Peters*, 475 F.3d 360 (D.C. Cir. 2007). The central issue on a motion for summary judgment is whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason for the adverse action and that the employer intentionally discriminated against the employee on the basis of her protected class. *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (citations omitted). The employee "may succeed in this either directly by persuading the [Commission] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981).  *See also Aka v. Wash. Hosp. Ctr.,* 156 F.3d 1284, 1298 (D.C. Cir. 1998) (plaintiff demonstrates pretext and survives summary judgment with circumstantial evidence calling into question the defendant's credibility on its asserted non-discriminatory reason).

### A. Plaintiff's Impairment does not bar her Claims.

Defendant first argues that it does not believe that Plaintiff is competent to prosecute this matter and the court should inquire into counsel's authority to prosecute this matter.  Plaintiff suffered an aneurysm in March 2016 as a result of work related stress and she does have physical

and cognitive impairments.  Defendant cites to a report from its expert that  the severity of Plaintiff's cognitive impairment renders her unlikely to respond accurately to questions posed to her should she testify at trial, citing to *Doraleh Container Terminal SA v. Republic of Djibouti*, Civ. A. No. 23-7023, 2024 WL  3573649, at *3 (D.C. Cir. July 30, 2024).  Despite her impairment, there is no bar to prosecuting this matter because the record has been fully developed with Plaintiff's evidence and testimony and rebuttal to the Agency's explanation for its actions in 2011 and the record contains Plaintiff's deposition testimony, and Defendant has had an opportunity to cross examine and question her.  Plaintiff resides with her amazing twin sister who cares for her and has power of attorney over her and continues her fight for justice.  This matter can be tried before the court and proceed  as any other case where the Plaintiff has an impairment or is no longer living.

> **B.    Ms. Blowe has established claims for discrimination based on race, sex and age in promotion and reprisal for the GS-14 position and the Agency's asserted legitimate non-discriminatory reason for Ms. Blowe's non-selection is not supported by the record because Ms. Blowe was superiorly qualified for the position.**

Defendant argues that Plaintiff's evidence does not support a finding of race, sex, age, or retaliatory discrimination.   Here, Defendant claims that most of Plaintiff's complaints are not personnel actions; Plaintiff cannot establish a causal connection between her EEO activity and the purported adverse actions; there is no evidence that any action was taken based on Plaintiff's race, sex, age or protected activity; and there are legitimate non-discriminatory reasons for the adverse actions.

Defendant further argues  that Plaintiff's non-selection claim fails because Defendant had a legitimate non-discriminatory reason for not selecting Plaintiff—the selectee was the best fit for

the job—and Plaintiff cannot show that the Defendant's reason for selecting the selectee was pretext for discrimination and that she suffered intentional discrimination.

There are triable issues of fact with respect to the information provided to the classifier in the desk audit which led the classifier to first conclude that Ms. Blowe's position was functioning at the grade 14 level but then reduced to grade 13 after speaking to Ms. Evans.  Further, it cannot be disputed that a white female was provided preferential treatment with training and Ms. Blowe was denied training.  Moreover, all of the events Ms. Blowe was subjected to by the management officials over the course of one year were severe and pervasive and subjected her to discrimination in the workplace, and the stress ultimately contributed to an aneurysm in 2016.

Concerning the non-selection, the Agency has failed to substantiate its claim that Mr. Clark was more qualified or a better fit  than Ms. Blowe, and thus did not meet its burden of production with regard to articulating a legitimate, non-discriminatory reason for Ms. Blowe's non-selection. *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (U.S. 1993) (*citing Burdine*, 450 U.S. at 254) ("The [Agency] must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action.").

Here, all the evidence indicates that Ms. Blowe's qualifications were vastly superior to Mr. Clark's.  It is undisputed that Ms. Blowe was performing all the Ethics Counselor work from January 2007 through February 2008, and again from November 2009 through May 2010.  Ex. A at 14.

The vacancy announcement and position description placed a strong emphasis on knowledge of the Agency's regulatory functions and internal procedures, and required constant contact with Agency employees.   While Ms. Blowe was working in the exact position for which she later applied, Mr. Clark had no experience in the Agency whatsoever.  Mr. Clark had worked

as an Ethics Counselor, but his experience was primarily as a trial attorney in the Marine Corps. The vacancy announcement specifically stated that the selectee would be in charge of developing, revising, and interpreting OSMRE ethics policy and procedures in compliance with the SMCRA, a law specific to the Agency's regulatory functions. Mr. Clark, as a Marine Corps attorney, had no knowledge of OSMRE ethics policy and procedures and no knowledge of the SMCRA. *See* ROI Ex. F11b at 166-70. Ms. Blowe, on the other hand, had been performing these exact duties as Ethics Counselor.

Mr. Clark and Ms. Blowe were not equally qualified. The undisputed fact is that the interview panel selected Ms. Blowe for the position. Mr. Woronka and Kim Hintz interviewed, scored, and ranked the candidates. *Id.*; Ex. E. Both Mr. Woronka and Ms. Hintz ranked Ms. Blowe first with a score of 24 and Mr. Clark second with a score of 23. ROI Ex. F12 at 189; Ex. E. Ms. Hintz informed Mr. Woronka that she wished to select Ms. Blowe because of her knowledge of OSMRE's mission, organization, and structure, and because she had routinely worked with employees of OSMRE and had established relationships and trust. ROI Ex. F12 at 188. The vacancy announcement states that the selectee is tasked with advising employees on conflicts of interest and necessary recusals; overseeing the annual ethics training program for OSM employees and providing training to senior officials and other employees; keeping OSM employees advised on the latest developments in ethics laws, regulations, and policies; and serving as the initial point of contact for the Office of Inspector General cases and referrals. Mr. Woronka recommended Ms. Blowe based on her experience and because she had acted as the Ethics Counselor previously and had managed the program and had knowledge of the program, had more inside experience and a strong training background, and had headed the executive development program at the time she was acting as the Ethics Counselor. *Id.*

Finally, the Agency places undue emphasis on the fact that Mr. Clark has a law degree. Both Mr. Pizarchik and Ms. Owens repeatedly refer to Mr. Clark's legal training as a significant factor in his selection. However, it is undisputed that the position does not require a law degree. Mr. Pizarchik makes a hopelessly vague claim that Mr. Clark's legal training is "helpful when analyzing ethical issues and providing answers." Conspicuously absent from Mr. Pizarchik's explanation is how Ms. Blowe's lack of legal training would render her less able or unable to analyze ethical issues or provide answers, particularly when she had been performing these duties with great success for nearly two years. This casts serious doubt on Ms. Owens' claim that the selection was not biased in favor of Mr. Clark due to his legal training.

For the reasons set forth above, the record demonstrates that Ms. Blowe was superiorly qualified for the position.

### C.    Ms. Blowe has demonstrated that the Agency's stated reason for her non-selection is pretext for discrimination by showing that the selection process was plagued with irregularities.

The Agency argues that Ms. Blowe cannot demonstrate pretext because she cannot show she was superiorly qualified to Mr. Clark. As set forth above, such is not the case. However, even if Ms. Blowe was not superiorly qualified, she has demonstrated pretext because the selection process was plagued with irregularities.

Immediately after receiving the results of the interview, Mr. Pizarchik took control of the selection process. Ex. C at 27:16-19. Based on Mr. Woronka's explanation, Mr. Pizarchik decided to move the position under the Director's Office. *Id.* at 30:20-31:3.

The selecting official for a position is the individual in whose office the position will be located. *See* Ex. C at 19:22-20:3; Ex. D at 31:12-19. A Position Description defines the office in which the position is to be located. A Position Description must be certified by the agency official who makes the classification/job grading decision. The Agency never issued a new Position

Description reflecting the position was placed under the Director's Office.  It is a violation of the law to change the reporting authority after the selection is made.   Furthermore, an employee cannot be reassigned until he/she has been in a new position for ninety days.

The undisputed evidence demonstrates that Ms. Blowe was selected for the Deputy Ethics Counselor position based on her years of experience with the Agency, including in the very same position for which she applied, her outstanding performance, and her knowledge of the Agency procedures and her rapport with Agency employees.  The Agency is required to provide a fairly administered selection process, which it did up to that point, resulting in Ms. Blowe's selection. *Salazar v. Wash. Metro. Area Transit Auth.,* 401 F.3d 504, 507 (D.C. Cir. 2005).

However, upon learning that the panel had selected an African American female with prior EEO activity, OSMRE Director Mr. Pizarchik illegally moved the position under his office and summarily selected Mr. Clark, a younger Caucasian male, for the position.  This establishes that the Agency's stated explanation for Ms. Blowe's non-selection is pretext for discrimination.  *See Lathram v. Snow*, 336 F.3d 1085, 1093-94 (D.C. Cir. 2003) (holding that a jury could draw an inference of discrimination where an agency departed from its normal process without justification); *Johnson v. Lehman*, 679 F.2d 918, 922 (D.C. Cir. 1982) (noting that although "a finding of a failure on the part of the prospective employer to follow its own regulations and procedures, alone, may not be sufficient to support a finding of discrimination," such a failure "is a factor that the trier of fact may deem probative in determining the true motivation behind the hiring decision of the prospective employer").

There were a number of highly suspect departures from the Agency's selection procedures for the Deputy Ethics Counselor position.  First, immediately after being informed that Ms. Blowe had been selected, Mr. Pizarchik and Ms. Owens decided to reassign the position from the F&A Division to the Director's Office.  The Agency never issued a new Position Description reflecting

the position was placed under the Director's Office.  A Position Description must be certified by the agency official who makes the classification/job grading decision, and this process was never followed.   It is a violation of the law to change the reporting authority after the selection is made. Furthermore, an employee cannot be reassigned until he/she has been in a new position for ninety days.

Next, Mr. Pizarchik and Ms. Owens decided to reinterview the top two candidates, Ms. Blowe and Mr. Clark.  Ex. C at 30:20-31:3. The Agency has not articulated a legitimate reason for Mr. Pizarchik or Ms. Owens to question, much less entirely reject, the recommendation of the interview panel.  A number of Agency employees recognize that it was highly atypical for Ms. Owens to be involved in a selection for the Agency.  Ex. A at 16; ROI Ex. F5 at 105; ROI Ex. F7 at 121.  Mr. Pizarchik and Ms. Owens interviewed Ms. Blowe in person; however, Ms. Owens was not present in Mr. Clark's interview and only participated by phone.  Ex. C at 74:19-75:8.  The Agency has offered no explanation for these irregularities.  Furthermore, Mr. Pizarchik asked the candidates highly improper questions such as whether they had an arrest record and whether they paid their taxes on time.  *Id.* at 59:4-61:9; Ex. D at 41:11-42:9.

Mr. Pizarchik and Ms. Owens relied exclusively on the interviews to buttress their claim that Ms. Blowe was less qualified.    However, Mr. Pizarchik has no recollection of the specific questions asked during the interviews.  Ex. C at 67:11-69:16.  The Agency has never produced a list of the questions used in the interview.  Moreover, Mr. Pizarchik did not produce the notes he took during the interview, despite specific requests from the Investigator.  The Agency is required to retain records of the selection process for two years after the selection or the resolution of a complaint regarding the selection.     Further, what little discussion of the interview questions offered by the second panelists is nonsensical.  The Agency claims that Ms. Blowe stated in the interview that she once made a mistake in offering advice.  Ms. Blowe explained her rebuttal that

the mistake occurred because she did not have correct information and once she received correct information, she addressed the issue.  In fact, Ms. Blowe refuted every false justification offered by the Agency.  In short, there is absolutely no evidence that the interviews demonstrated that Ms. Blowe was less qualified than Mr. Clark.  Accordingly, because the Agency deliberately violated its own document retention policy and the factfinder is now unable to reconstruct the interview process, Ms. Blowe is entitled to an adverse inference against the Agency regarding performance on the interview.  *See Talavera v. Shah,* 638 F.3d 303 (D.C. Cir. 2011).[1]

The record demonstrates that immediately after learning Ms. Blowe was selected for the position Mr. Pizarchik and Ms. Owens took over the selection process, illegally reassigning the position under the Director's Office to give themselves selecting authority and conducting a sham interview to place Mr. Clark in the position.  The Agency thus failed in its obligation to provide a fairly administered selection process.  Because the Agency has not provided any evidence that these illegal and highly irregular selection procedures were justified, Ms. Blowe has demonstrated that the Agency's assertion that she was less qualified for the position is pretext for discrimination.

**D.    Ms. Blowe's retaliation claim requires a trial to determine the credibility of Ms. Owens' claim that she was unaware of Ms. Blowe's prior EEO activity.**

The Agency argues that Ms. Blowe cannot establish a *prima facie* case of retaliation for some of the claims because the protected activity predates some of the actions that she complains about.  Plaintiff's chief complaint is the non-selection and it clearly was retaliatory.  The Agency denies that Ms. Owens was aware that she engaged in protected activity prior to the selection. However, whether Ms. Owens was aware of Ms. Blowe's protected activity requires a credibility determination as to Ms. Owens, which can only be made at a hearing.

The Agency rests its argument on Ms. Owens' blanket denial that she knew anything about Ms. Blowe's prior EEO complaint. However, Ms. Owens met with Ms. Mackey-Bryant on a recurring basis for a briefing on EEO complaints filed against the Agency. Ex. A at 16. Ms. Owens does not deny that these meetings occurred. Instead, the Agency speculates that merely statistical information was discussed. Without any evidence as to what actually was discussed at these meetings, there is no basis to assume that Ms. Owens, the Deputy Director of OSMRE, was not apprised of pending EEO Complaints at these meetings.

Furthermore, in light of the other facts on the record, particularly the highly irregular selection process used to place Mr. Clark in the position, the credibility of the Agency's witnesses, and the true motives for the rejection of the panel's selection of Ms. Blowe are critical issues. A trial is the only way to determine whether Ms. Owens' claim that she was unaware of Ms. Blowe's EEO Complaint is true.

## CONCLUSION

For the reasons set forth above, Complainant Judith Blowe respectfully requests the Defendant's Motion for Summary Judgment be denied and this matter set for a trial.

Respectfully submitted,

/s/ David A. Branch
David A. Branch
Law Office of David A. Branch
& Associates, PLLC
1120 Connecticut Avenue, NW
Suite 500
Washington, D.C. 20036
(202) 785-2805 phone
davidbranch@dbranchlaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 30th day of January 2025, the foregoing was served electronically via the Court's CM/ECF e-filing system on counsel for Defendant listed below:

Kaitlin K. Eckrote, D.C. Bar #1670899
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252–2485
Kaitlin.Eckrote@usdoj.gov

_/s/ David A. Branch_
David A. Branch