UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JUDITH BLOWE, <br><br> Plaintiff, <br><br> v. <br><br> DOUG BURGUM, <br><br> Defendant. | Civil Action No. 15-822 (JEB) |

## MEMORANDUM OPINION

In the spring of 2009, Barack Obama was the newly inaugurated President of the United States, *American Idol* was the country's top-rated television program, and Plaintiff Judith Blowe was working as a Human Resources Specialist in the Office of Surface Mining Reclamation and Enforcement at the Department of the Interior. After suffering several perceived slights at work, Blowe — a Black woman who was then 46 years old — filed three Equal Employment Opportunity complaints alleging a hostile work environment; race-, sex-, and age-based discrimination; and retaliation. She then brought this action against the Secretary of the Interior, claiming the same violations under Title VII and the Age Discrimination in Employment Act. During this litigation, Blowe developed serious health problems, which required multiple extensive delays. With the matter back on track, Defendant has now moved for summary judgment. Because no reasonable jury could find that Plaintiff was subjected to unlawful discrimination, the Court will grant the Motion.

1

## I. Background

### A. Factual Background

Because the Court is considering Defendant's Motion for Summary Judgment, it will construe the facts in the light most favorable to Plaintiff. See Talavera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011).

At all relevant times, Blowe worked in Human Resources at the Department of the Interior. See ECF No. 89-1 (Pl. Statement of Undisputed Material Facts (SUMF)), ¶ 1. Her first-level supervisor was Yvette Evans, a Black woman over the age of 40, and her second-level supervisor was Ted Woronka, a White man also over 40. Id., ¶ 2. In April 2009, Plaintiff sought a desk audit of her position in the hopes of upgrading its level from GS-13 to GS-14, and Woronka agreed to request one. Id., ¶ 4; ECF No. 84-9 (1st Judith Blowe Aff.) at 60:18–61:6, 62:21–62:22. A desk audit is a process in which a federal employee's tasks are assessed to determine whether her role should be upgraded or degraded in level. Brian Harper, a Black man who was a Human Resources Specialist in the Department, conducted that desk audit. See ECF No. 84-18 (Brian Harper Aff.) at 130:13–130:17, 131:12–132:14. After collecting information about Blowe's responsibilities and work product and comparing his findings to the standards set out in the description for her role, Harper informed Evans that he believed an upgrade to GS-14 was indeed appropriate. See ECF No. 84-20 (Harper Dep. pp. 17–20) at 19:14–19:20. When Evans reported that Blowe was no longer carrying out certain duties, however, Harper revised his recommendation to conclude that Plaintiff's position should remain at the GS-13 level. See ECF No. 84-19 (Harper Dep. pp. 21–24) at 21:1–21:16; Pl. SUMF, ¶ 6. Blowe then unsuccessfully appealed Harper's desk-audit determination. See Pl. SUMF, ¶¶ 7–8.

Also beginning in April 2009, Plaintiff asked to attend several trainings and was told by Evans that she could not. Id., ¶¶ 9–35. To Blowe's chagrin, however, Evans authorized Lisa Wise, a White colleague, to attend some of the same trainings. See 1st Blowe Aff. at 72:3–72:11, 77:16–78:21; 81:06–82:20. As a result of those events, Blowe filed her first two EEO complaints (in April and August 2010) alleging race, color, sex, and age discrimination, as well as retaliation and a hostile work environment. See Pl. SUMF, ¶¶ 43–44.

At various points during her tenure at the agency, Plaintiff acted as a part-time ethics counselor on top of her duties in Human Resources. Id., ¶¶ 36–41. In March 2010, the Department announced an opening for a Deputy Ethics Counselor. Id., ¶ 46. Blowe applied for the position and interviewed the next month with Woronka and Kimberly Hintz, the Deputy Director of the Departmental Ethics Office. Id., ¶¶ 48, 53. After that interview, Woronka and Hintz submitted Plaintiff's name as their preferred candidate. Id., ¶ 55. The agency, however, interviewed Blowe and another finalist a second time in May 2010. Id., ¶ 56; ECF No. 84-39 (2d Blowe Aff.) at 70. That interview was conducted by Joe Pizarchik (a White man over 40) and Glenda Owens (a Black woman over 40), the Director and Deputy Director of the Office of Surface Mining Reclamation and Enforcement, respectively. See Pl. SUMF, ¶¶ 49–50, 56; 2d Blowe Aff. at 70. Ultimately, Plaintiff was not selected for the promotion; the agency instead hired Craig Clark, a licensed attorney who had worked as an ethics counselor in the Marine Corps. See Pl. SUMF, ¶¶ 62–66. Clark is a younger White man. See 2d Blowe Aff. at 77.

At the end of fiscal year 2010, the Department dealt the final blow. Plaintiff received the second-highest performance rating — superior — from Evans, her first-line supervisor, the same rating that she had received in 2009. See Pl. SUMF, ¶¶ 67–68, 70. After appealing to Woronka, her evaluation was changed to exceptional, the highest rating available. Id., ¶¶ 71–

3

72. She then filed her third and final EEO complaint for retaliation, race discrimination, and a hostile work environment. Id., ¶ 45.

Four years later, Plaintiff filed this action. See ECF No. 2 (Am. Compl.). She alleges one count of race and sex discrimination (Count I); one count of retaliation (Count II); and one count of age discrimination (Count III). Id., ¶¶ 38–55. Defendant now moves for summary judgment. See ECF No. 84-1 (MSJ).

## II.  Legal Standard

Summary judgment must be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, 477 U.S. 242, 247–48 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. Liberty Lobby, 477 U.S. at 248; Holcomb, 433 F.3d at 895. A dispute is "'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Liberty Lobby, 477 U.S. at 248; see also Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006); Aka v. Washington Hospital Center, 156 F.3d 1284, 1288 (D.C. Cir. 1998) (*en banc*). The court must "eschew

4

making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). The non-moving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). The non-movant, in other words, is required to provide evidence that would permit a reasonable jury to find in his favor. See Laningham v. U.S. Navy, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

**III.   Analysis**

In seeking summary judgment, the Government contends that Plaintiff has conceded several of her claims and has otherwise failed to meet the standards required to make out hostile-work-environment, discrimination, and retaliation claims. The Court proceeds in that order, pausing first to discuss the issue of competence.

A.   Competence

This case was stayed for several years after Blowe suffered a life-threatening medical event in 2016. See ECF No. 14 (Mot. to Stay); Minute Order of Apr. 18, 2016. Because Plaintiff's memory and cognitive ability have been severely impaired as a result of that event, Defendant believes that she is not competent to prosecute this litigation. See MSJ at 4. After holding a hearing on this issue, the Court appointed a potential guardian *ad litem*. See Minute Order of July 9, 2025; Minute Entry of July 17, 2025. The potential guardian has now reported back that Blowe's sister has a valid power of attorney over her and can thus safeguard her interests. See ECF No. 89 (Opp.) at 22–23 (noting power of attorney). The Court is

accordingly satisfied that Plaintiff wishes to go forward with this suit and that it is in her best interest to do so.

### B. Hostile Work Environment

Blowe initially claimed that she was subjected to a hostile work environment. See Am. Compl., ¶¶ 48, 54. Given that she does not provide any response whatsoever to Defendant's argument that she has not established the elements for such a claim, however, she has conceded it. See Wilkins v. Jackson, 750 F. Supp. 2d 160, 162 (D.D.C. 2010) ("It is well established that if a plaintiff fails to respond to an argument raised in a motion for summary judgment, it is proper to treat that argument as conceded."); ECF No. 93 (Reply) at 1–2. In her briefing, Blowe at best gestures vaguely to her erstwhile hostile-work-environment claim by stating that "all of the events [she] was subjected to by the management officials over the course of one year were severe and pervasive." Opp. at 24. That oblique statement does not keep this issue alive.

In any case, Plaintiff falls well short of the high bar for demonstrating a hostile environment. "A plaintiff must show that his employer subjected him to discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Achagzai v. Broad. Bd. of Governors, 170 F. Supp. 3d 164, 183 (D.D.C. 2016) (cleaned up); see also Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013). In evaluating a hostile-environment claim, a court "looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (citing Faragher v. City of Boca Raton, 524 U.S. 775, 787–88 (1998)). By adhering to these standards, courts thereby "ensure that [employment-discrimination law] does not become a general civility code"

that involves courts in policing "the ordinary tribulations of the workplace." Faragher, 524 U.S. at 788 (citations and internal quotation marks omitted). While a plaintiff need not prove a hostile work environment at this stage, she still must produce facts sufficient to allow a jury to find "extreme" conduct that satisfies the "demanding" standard for such a claim. Id.

Blowe does not carry her burden. Whether considered singly or in concert, none of her complained-of incidents — declining to upgrade her position, refusing to allow her to attend trainings, awarding her only the second-highest performance rating, and hiring somebody else for a job — rises to the level of conduct that is "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quotation marks omitted). She instead points to "work-related actions by supervisors" that "courts typically do not find . . . to be sufficient for a hostile work environment claim." Munro v. LaHood, 839 F. Supp. 2d 354, 366 (D.D.C. 2012) (quotation marks omitted). That is because "the removal of important assignments, lowered performance evaluations, and close scrutiny of assignments by management," while perhaps unpleasant, cannot "be characterized as sufficiently intimidating or offensive in an ordinary workplace context." Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009). What is more, Plaintiff has offered only conclusory assertions that those actions had anything to do with her protected characteristics, as will soon be discussed in greater detail. The Court will thus grant Defendant's Motion with respect to the portions of Blowe's counts that claim a hostile work environment.

    C.    Discrimination

Title VII makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). The Supreme Court established the three-part burden-shifting framework that governs traditional claims of employment discrimination in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973). Under that framework, the plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. In keeping with "the Supreme Court's emphasis on flexibility" in this area, our Circuit has adopted a "general version of the *prima facie* case requirement: the plaintiff must establish that (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination." Chappell-Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) (quotation marks omitted). An adverse employment action is one that causes "some harm." Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024).

After a plaintiff makes that preliminary showing, "'[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason' for its action. If the employer succeeds, then the plaintiff must 'be afforded a fair opportunity to show that [the employer's] stated reason . . . was in fact pretext' for unlawful discrimination." Chappell-Johnson, 440 F.3d at 487 (quoting McDonnell Douglas, 411 U.S. at 802, 804) (internal citations omitted). When "an employee has suffered an adverse employment action and an employer has asserted a legitimate, non-discriminatory reason for the decision, the district court need not — and should not — decide whether the plaintiff actually made out a *prima facie* case under McDonnell Douglas." Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis omitted). The court's task in such cases is to "resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally

8

discriminated against the employee on the basis of race, color, religion, sex, or national origin?" Id.  The "relevant inquiry" is thus whether an employee has "produced sufficient evidence for a reasonable jury to conclude that the [defendant's] asserted nondiscriminatory reason for firing her was not the actual reason, and that instead the [defendant] was intentionally discriminating." Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1114 (D.C. Cir. 2016).  The foregoing framework applies to ADEA claims as well.  Hall v. Giant Food, Inc., 175 F.3d 1074, 1077 (D.C. Cir. 1999).

Blowe bases her discrimination claim on seven of Defendant's actions: (1) providing false and misleading information during her desk audit; (2) removing her work duties; (3) giving her colleagues credit for her work; (4) denying her an increase to GS-14; (5) denying her access to training; (6) issuing her a performance evaluation of "superior"; and (7) not selecting her for the position of Deputy Ethics Counselor.  See Am. Compl., ¶ 42.  The first four actions relate to the desk audit.  Id., ¶¶ 7–16.  The Court analyzes those together before proceeding separately to the remaining three.

### 1. *Desk Audit*

Blowe believes that the desk audit was rife with discriminatory actions.  As she tells it, her first-line supervisor, Evans, was obstinately opposed to classifying her position as a GS-14 role.  See Opp. at 4–6, 9–11; 1st Blowe Aff. at 62:1–62:20.  In an effort to prevent any upgrade to Blowe's role, Evans got together with Harper, the auditor, and the two were "in cahoots."  1st Blowe Aff. at 63:3–63:7.  Plaintiff contends that Evans fed Harper false information about the role's responsibilities, took away Blowe's job duties, and gave credit to herself and others for Blowe's work.  See Am. Compl., ¶¶ 11,15; 1st Blowe Aff. at 68:15–69:5, 69:18–70:20, 75:19–

9

76:9. According to Plaintiff, Evans's resistance can be chalked up only to discriminatory motives. See Opp. at 10.

To begin, Blowe provides only one conclusory sentence of legal argument regarding her desk-audit claims. Id. at 24 ("There are triable issues of fact with respect to the information provided to the classifier in the desk audit which led the classifier to first conclude that Ms. Blowe's position was functioning at the grade 14 level but then reduced to grade 13 after speaking to Ms. Evans."). Given that cursory handling, she has arguably forfeited those claims. See Al-Tamimi v. Adelson, 916 F.3d 1, 6 (D.C. Cir. 2019) ("Mentioning an argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones is tantamount to failing to raise it.") (quotation marks omitted); Reply at 3.

To the extent that the desk-audit arguments remain on the table, however, they fail to establish a *prima facie* case of discrimination. Assuming for Plaintiff's sake that Evans did in fact provide false information about her duties during the desk audit and that Harper's final recommendation turned on that information — which he denies, see Harper Aff. at 135:10–136:22 (stating that he relied only partly on Evans's input and that she did not "steer[] the outcome") — Blowe still comes up empty. That is because Title VII contains a causation requirement: to be held liable, the employer must have taken the adverse action "because of" the employee's membership in a protected class. Bostock v. Clayton County, 590 U.S. 644, 656 (2020) (quotation marks omitted); accord Stewart v. Evans, 275 F.3d 1126, 1133 (D.C. Cir. 2002) ("Title VII does not prohibit all forms of workplace harassment, only those directed at discrimination because of [a protected characteristic]."). That requirement is satisfied

10

"whenever a particular outcome would not have happened 'but for' the purported cause." Bostock, 590 U.S. at 656.

Blowe argues, without factual support, that Evans (herself also a Black woman) took action against Plaintiff because of her race. Her allegation of discrimination largely boils down to a gut feeling. As Blowe tells it, she "figure[s] [Evans's actions] had to do with [her] being Black" because, when she raised the desk audit, Evans "just went after [her]," including by stating that level increases typically did not occur without the supervisor's supports. See 1st Blowe Aff. at 70:21–71:8. Making a sizable logical leap, Blowe concluded that the reason for Evans's reluctance "was that . . . [Plaintiff] was Black." Id. at 71:7–71:8. Given that Evans "didn't even know" her, it was "the only thing that [Plaintiff] could surmise" accounted for her supervisor's lack of support. Id. This is sheer conjecture.

Blowe, attempting to bolster that flimsy accusation, also points to Evans's better treatment of Lisa Wise, a White female coworker. Id. at 71:9–73:9. There is no discernible causal connection, however, between Evans's apparent preference for Wise and Wise's race. Blowe herself denied that Evans ever "ma[de] comments indicating a bias in favor of Caucasian employees," id. at 72:1–72:3, and freely acknowledged that she "[didn't] have any evidence" of such bias having a role in Wise's superior treatment. Id. at 73:6–73:7. Rather, Plaintiff insisted that her supervisor's supposed discriminatory motive was "what [Blowe] felt" was the reason for her giving Wise certain opportunities, id. at 72:19–72:22, 73:5, and was based entirely on her own "perception" of events. Id. at 73:8–73:9.

Almost needless to say, the Court cannot draw "an inference of discrimination," Chappell-Johnson, 440 F.3d at 488 (quotation marks omitted), solely from Plaintiff's subjective perceptions of why Evans may have interfered with the desk audit. Indeed, the auditor himself,

11

who is also Black, denied that Evans had made a "deliberate attempt to determine the outcome of the upgrade," Harper Aff. at 137:4–137:5, or that she had acted with discriminatory motives. Id. at 137:18–138:15. He instead attributed any conflict between Plaintiff and her supervisor to "tension on a personal level." Id. at 138:6–138:10. Because Blowe has not "produc[ed] any evidence that gives rise" to an inference that the desk audit's unfavorable result was caused by her race, she has not established a *prima facie* case for any of the desk-audit claims. Chappell-Johnson, 440 F.3d at 488. There is nothing, furthermore, either in the record or Plaintiff's briefing to establish any link between the audit's results and Blowe's sex or age.

### 2. *Training*

Next, Blowe takes issue with Evans's denials of her requests to attend certain trainings. According to Plaintiff, Evans repeatedly refused to give her permission and funding to go to training events despite allowing Wise, her White colleague, to attend several of them. See Opp. at 5–6, 10. Blowe contends that those denials constitute unlawful discrimination.

Plaintiff again supplies one paltry statement of legal argument regarding her training claim. Id. at 24 ("[I]t cannot be disputed that a White female was provided preferential treatment with training and Ms. Blowe was denied training."). Assuming that the training claim nevertheless remains, but see Al-Tamimi, 916 F.3d at 6; Reply at 3, it stumbles off the starting block. As with her desk-audit claim, Blowe has identified no reason to believe Evans's training-related decisions were because of her race. Her argument rests solely on her feelings about the training denials, which the following exchange encapsulates:

> [EEO Investigator]: What leads you to believe that in the denial of these various training and meeting requests that you submitted to Ms. Evans, she denied those not because of money or other reasons but because of your being African-American?

> [Blowe]: I believe it was based on my race because of the simple fact how she made special provisions for Lisa [Wise] and she doesn't for me.

1st Blowe Aff. at 82:7–82:11; see also id. at 83:3–83:12; Opp. at 5–6 ("Ms. Blowe believes she was denied training because of her race because the White female Lisa Wise was allowed to attend the training.").

Again, the bare fact of Plaintiff's and Wise's races would not allow a reasonable jury to infer that Evans acted unfavorably toward Blowe because of her race — particularly because Plaintiff has not introduced evidence to establish that they are similarly situated. As before, she also offers nothing to establish a sex- or age-based link to these actions. See Joyner v. Morrison & Foerster LLP, 140 F.4th 523, 531 (D.C. Cir. 2025) ("[I]t cannot be enough to simply allege that the plaintiff was treated differently from a 'similarly situated' comparator, without additional [evidence] showing the comparators are in fact 'similarly situated' in some meaningful respect."); Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 302 (D.C. Cir. 2015) (absent evidence of similarities, different treatment of "putative comparators [can]not support a jury conclusion that [the employer] discriminated against [the plaintiff]"); Montgomery v. Chao, 546 F.3d 703, 707 (D.C. Cir. 2008). Plaintiff has therefore not established a *prima facie* case for her training claim.

### 3. *Performance Evaluation*

Turning to the performance-evaluation issue, Plaintiff decries her second-best "superior" rating for fiscal year 2010, believing that she deserved the highest rating of "exceptional." Am. Compl., ¶ 33. In her Opposition, however, Blowe does away with this claim entirely. See Opp. at 24 (omitting performance evaluation from list of triable issues of fact). For good reason — following her appeal, Plaintiff's rating was revised up to "exceptional." Pl. SUMF, ¶ 72.

Insofar as she has not conceded her performance-evaluation claim, but see Wilkins, 750 F. Supp. 2d at 162; Reply at 4, then, Blowe's claim fails because she did not suffer any harm as a result of the "superior" rating. See Muldrow, 601 U.S. at 355.

### 4. *Non-Selection as Deputy Ethics Counselor*

Finally, the Court arrives at Plaintiff's challenge to her non-selection as Deputy Ethics Officer. She contends that that she was not picked for the role because of her age, race, and sex, given that Clark — a younger White man — was ultimately hired. See Opp. at 27. The Government rejoins that Clark was chosen for a legitimate, nondiscriminatory reason: he "was the best fit for the job" in light of his educational background and work experience, as well as Blowe's inferior performance in the interview. See MSJ at 32–38. Blowe, in turn, insists that Defendant's stated rationale is pretext because she was better qualified for the position. See Opp. at 23–29. Plaintiff understandably spills the most ink on this claim, which is the most compelling of the arguments she brings. Still, she misses the mark.

There is "no question that failure to promote is an 'adverse action,'" Stella v. Mineta, 284 F.3d 135, 146 (D.C. Cir. 2002), or that a candidate's superior qualifications are legitimate, nondiscriminatory reasons to hire him. Butler v. Sebelius, 842 F. Supp. 2d 273, 276 (D.D.C. 2012). There is therefore no need to delve into whether Plaintiff has established a *prima facie* case. The key issue here, then, is "whether Plaintiff has 'produced sufficient evidence for a reasonable jury to find that Defendant's asserted nondiscriminatory reason' is mere pretext for unlawful discrimination." Id. at 277 (quoting Brady, 520 F.3d at 494). One way to show pretext is to establish Plaintiff's superior qualifications. Blowe, however, cannot merely provide "[e]vidence that [she] was better qualified" than Clark; rather, "a jury must be available to find [she] was 'significantly better qualified for the job.'" Id. (quoting Holcomb, 433 F.3d at

14

897). "The difference must be 'great enough to be inherently indicative of discrimination.'" Id. (quoting Jackson v. Gonzalez, 496 F.3d 703, 707 (D.C. Cir. 2007)).

The Government points to two factors that led it to select Clark over Blowe: his professional experience and her interview performance. See MSJ at 32–44. For starters, Clark "brought knowledge and experience [with] running an ethics program" given his time as an ethics counselor in the Marine Corps, where he "managed the ethics program" at a base. See ECF No. 84-46 (Kimberly Hintz Aff.) at 110. Because of that experience and his legal education, "he was familiar with the criminal code and the ethics regulations," which "are uniform across all executive branch agencies[,] including the Marines." Id. He would accordingly have been able to "hit the ground running" if hired, which is what the selection panel "wanted" from the new hire. Id.; accord ECF No. 84-45 (Ted Woronka Aff.) at 105; ECF No. 84-49 (Joseph Pizarchik Aff.) at 97 ("We needed the candidate who knew the most about the ethics, someone who could develop a program and create a training program."). After the first interview, one interviewer (Hintz) initially rated Clark the highest but ultimately did not recommend his selection out of a concern that he would not stay in the position for long. See ECF No. 84-48 (Glenda Owens Aff.) at 101. In the second round of interviews conducted by Pizarchik and Owens, for which only Clark and Blowe were selected, "none of [Clark's] answers caused [Owens] any concern." Id. at 100. He "had good examples of ethics issues and the way he handled them" and "showed . . . that he could provide the analysis needed." Id. at 101. In doing so, he "demonstrated a better understanding of the ethical issues during the interview than [Blowe]." Pizarchik Aff. at 98. Clark's references, moreover, were "glowing." Owens Aff. at 100.

Blowe, on the other hand, had different strengths. She was "enthusiastic," with "the ability and willingness to learn the job," and possessed "background and knowledge of working in the department and in [the Office of Surface Mining]." Hintz Aff. at 110. She did not, however, "have as strong of an ethics background" as Clark did. Id. While the initial selection panel recommended Plaintiff as their top choice for the position, see id.; Woronka Aff. at 105, they later explained that they did so only because they believed "she would stay longer in the position than [Clark]." Pizarchik Aff. at 97. In the second-round interview, Blowe raised new red flags. For instance, she suggested that she could perform other duties in addition to the Ethics Counselor role despite being informed that the position "had to be a full time commitment." Owens Aff. at 100. When asked to give an example of assisting with an ethics issue, moreover, she recounted "looking up the answer and reading [it]" to the employee rather than providing an anecdote that demonstrated analytical ability. Id. at 101. Pizarchik therefore found much of Plaintiff's interview "concern[ing]," including — in addition to the above — providing nonresponsive answers, emphasizing "forms" rather than "substance," and suggesting that employees of the office should not be required to file ethical-disclosure forms. See Pizarchik Aff. at 97–98. Last, when asked for a reference, Evans "did not have any concerns" about Blowe's performance but indicated that she did only a "fine job filling in" for the ethics counselor position. See Owens Aff. at 100.

Both candidates were thus qualified, as those involved in the hiring process have acknowledged. See Hintz Aff. at 110; Woronka Aff. at 105. Yet, even with the benefit of all inferences from the evidentiary record, Plaintiff can demonstrate that, at best, she was only slightly more qualified for the Deputy Ethics Counselor position. See Opp. at 25 (noting that, after first interview, Blowe received score of 24 and Clark received score of 23). Indeed, given

16

her sparser ethics resume and less-than-ideal answers to the interview questions, a reasonable jury could conclude that she was less so. See Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1294 (D.C. Cir. 1998) ("In a close case, a reasonable [factfinder] would usually assume that the employer is more capable of assessing the significance of small differences in the qualifications of the candidates, or that the employer simply made a judgment call."). It is clear, consequently, that the gap between Blowe's and Clark's qualifications for the position was not "great enough to be inherently indicative of discrimination" such that she has shown that the Government's legitimate reasons for choosing Clark are mere pretext. Jackson, 496 F.3d at 707 (quotation marks omitted); see also Aka, 156 F.3d at 1296 (finding evidence of qualifications gap sufficient to defeat summary judgment where plaintiff had nineteen years of relevant work experience while selectee had two months of volunteer experience). There is therefore no evidence that the selection team (including Owens, who is also an older Black woman) discriminated against Blowe by selecting another candidate. See Woronka Aff. at 105–06; Hintz Aff. at 111; Owens Aff. at 102 ("Her race and sex, and age[,] had no role in the selection process."); Pizarchik Aff. at 99 ("I do not believe that race, age, sex or prior EEO complaint activity were factors in this selection decision.").

\* \* \*

Blowe, consequently, has identified no evidence that could support a jury verdict of discrimination. In the course of this litigation, in fact, she has at times expressly disavowed the notion that she was discriminated against on the basis of her race, sex, or age. See ECF No. 84-8 (Pl. Resp. to Interrogs.) at 12 ("No one specifically made comments about my race, gender, or age."); ECF No. 84-13 (1st Blowe Dep.) at 38:13–40:10 (denying that she was "discriminated

17

against on account of [her] race," "because [she is] a lady as opposed to a man," or "on the basis of [her] age."). The Court will therefore grant Defendant's Motion with respect to those counts.

    D.    Retaliation

Nearing the finish line, the Court turns to Plaintiff's claim that she was a victim of retaliation for protected activity — namely, filing an EEO complaint. Blowe has expressly abandoned most of her retaliation claims, leaving the Court only with the same non-selection just discussed. See Opp. at 29 ("Plaintiff's chief complaint is the non-selection . . . .").

"To prove retaliation, the plaintiff generally must establish that he or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to bring a discrimination claim." Baloch, 550 F.3d at 1198. The standard for surviving summary judgment on a retaliation claim is the same as for a discrimination claim. See Jones v. Bernanke, 557 F.3d 670, 678 (D.C. Cir. 2009) (foregoing analysis "appl[ies] equally to retaliation claims"). Because the Government has provided a legitimate, nondiscriminatory reason for selecting Clark for the promotion, it has likewise shown a nonretaliatory reason for the same conduct. See Porter v. Shah, 606 F.3d 809, 814–17 (D.C. Cir. 2010) (resolving discrimination and retaliation claims for same conduct together).

Before concluding, the Court addresses the last arrow in Blowe's quiver. Plaintiff makes much of her belief that the two rounds of interviews and Owens's involvement made the selection process for the Deputy Ethics Counselor position "highly irregular." Opp. at 11–12, 20, 26–30. Blowe also believes that Evans, angered by her filing of an EEO complaint, intervened in the selection and sabotaged her candidacy. Id. at 20. According to Blowe, those irregularities demonstrate that the Government "conduct[ed] a sham" process to avoid choosing her for the position. Id. at 29. But the record suggests that the selection procedures were not so

unusual after all.  Owens explained that she participated in the selection because the position was moved to her office, deeming her the direct supervisor of whoever would be hired.  See Owens Aff. at 102.  She similarly insisted that "it was not a deviation" for her to interview a GS-14 candidate.  The evidence also indicates that the selecting officials conducted a second round of interviews not for discriminatory purposes but because they were "disconcert[ed]" at the prospect of selecting Blowe out of a concern that Clark would not remain in the job for long; Pizarchik explained that, given his belief that they "should hire the best candidate," he "thought it made sense that [they] interview the top two candidates again."  Pizarchik Aff. at 97.

       Further, the only evidence — such as it is — of Evans's interference with the selection process comes from Blowe's own unsupported conjectures.  Blowe pieces together Evans's purported involvement from the fact that Evans asked for copies of the candidates' resumes and later "walked into [Pizarchik's] office."  2d Blowe Aff. at 76.  Plaintiff's accusation is contradicted, however, by those who conducted the selection process.  See Woronka Aff. at 105 ("I do not have any specific information about Ms. Evans['s] involvement in this selection."); Hintz Aff. at 111 ("I have no knowledge of [Evans] having any influence."); Owens Aff. at 101 ("Evans played no role and had no influence in the selection process. . . . I do not recall if Ms. Evans brought the applications to my office, but if she did that would not be unusual since she is the HR Director."); Pizarchik Aff. at 99 ("To my knowledge . . . [Evans] did not play a role in . . . the vacancy.").  Indeed, when asked for a reference for Plaintiff, Evans "said nothing negative" and stated that she "did not have any concerns."  Owens Aff. at 100–01.  Blowe therefore has not demonstrated that the Government altered the selection process in response to her EEO complaint.

Perhaps most importantly, the record demonstrates that the selecting officials were unaware of Blowe's EEO activity. See Owens Aff. at 99 ("I was not aware of her earlier complaint."), 102 ("I was not aware [Blowe] had a complaint against Ms. Evans."); Pizarchik Aff. at 96 ("I was not aware of her EEO complaint."). Any assertion to the contrary is Blowe's own guesswork. See, e.g., ECF No. 84-54 (2d Blowe Dep.) at 36:19–36:20 ("I'm just making an assumption [that Owens knew about the complaint]. I don't know."); id. at 34:4–36:22. Given that lack of awareness, Plaintiff cannot show that Defendant's legitimate reasons for not selecting Blowe were pretext for retaliation. See Jones, 557 F.3d at 679 (holding "supervisors could not have retaliated against [Plaintiff] unless they had knowledge of [her] protected activity").

## IV.  Conclusion

For the foregoing reasons, the Court will grant Defendant's Motion. A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date: August 18, 2025